**☐ ORIGINAL**

Todd C. Tucci (ISB # 6526)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
ttucci@advocateswest.org

Attorney for Plaintiff Center for Biological Diversity

```
┌─────────────────────────────────┐
│ ____FILED_____  LODGED_____    │
│ ____RECEIVED___  COPY            │
│ ┌─────────────────────────────┐  │
│ 5 │      JUN - 4 2010        │ 5 │
│ └─────────────────────────────┘  │
│   CLERK U S DISTRICT COURT       │
│     DISTRICT OF ARIZONA          │
│ BY_____ DEPUTY    │
└─────────────────────────────────┘
```

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

CENTER FOR BIOLOGICAL DIVERSITY )
     Plaintiff, )
)
vs. )
)
HEATHER PROVENCIO, District Ranger; )
U.S. FOREST SERVICE, an agency of the United )
States; and U.S. FISH AND WIDLIFE SERVICE, )
an agency of the United States )
     Defendants. )

**CIV10·330 TUC JMR**

Case No.

## NATURE OF ACTION

1.    This action seeks declaratory and injunctive relief requiring Defendant U.S. Forest Service to adhere to federal law in its management of the Fossil Creek Range allotment in central Arizona, and to halt the ecological degradation which livestock grazing is causing upon the public lands and wildlife habitat – including habitat for the threatened Chiricahua leopard frog, which the Forest Service acknowledges is teetering on extirpation in the Fossil Creek Range allotment. The Forest Service's own documents amply demonstrate in detail that livestock are degrading the public lands and wildlife habitat in the Fossil Creek Range allotment, yet the Forest Service refuses to make meaningful changes in grazing management.

2.    This action also seeks reversal of the U.S. Fish and Wildlife Service's Biological Opinion ("BO") on the Fossil Creek Range allotment – which concluded that the Forest

Service's grazing plan would not jeopardize the Chiricahua leopard frog – because the BO failed to comply with the minimum requirements of the Endangered Species Act by (1) failing to identify a permissible level of "take" under the ESA, and (2) failing to provide a reasonable trigger for reconsultation, save for the complete extirpation of the frog in the Fossil Creek Range allotment.

3.      Specifically, the Forest Service's final decision on the Fossil Creek Range allotment violates the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.* ("NFMA"); the Coconino National Forest Plan; the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* ("ESA"), and the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").  For its part, the U.S. Fish and Wildlife Service's final Biological Opinion violates the APA and the ESA.

4.      Accordingly, immediate injunctive and/or declaratory relief is required to ensure that Defendants adhere to the requirements of law in administering livestock grazing within the Fossil Creek Range allotment, and to prevent further and irreparable harm to riparian, aquatic and upland habitat and conditions, and other critical resource values resulting from Defendants' unlawful actions.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the National Forest Management Act, 16 U.S.C. §§ 1600 *et seq.*, the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, the Administrative Procedure Act, 5 U.S.C. § 706; and the Declaratory Judgment Act, 28 U.S.C. § 2201  *et seq.*

6.     Venue is properly vested in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because Center for Biological Diversity resides in this district, Defendants U.S. Forest Service and U.S. Fish and Wildlife Service have offices in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

7.     On December 28, 2009, the Center for Biological Diversity provided the U.S. Forest Service and the U.S. Fish and Wildlife Service with sixty day notice of its intent to sue, as required under the Endangered Species Act, 16 U.S.C. §1540(g).

8.     An actual, justiciable controversy now exists between Plaintiff and Defendants, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 16 U.S.C. § 1540(g), and the government has waived sovereign immunity pursuant to 16 U.S.C. § 1540(g)(1).

## PARTIES

9.     CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit conservation organization with approximately 245,000 members and online activists dedicated to the preservation, protection, and restoration of biodiversity and ecosystems throughout the world, including in the Coconino National Forest in Arizona. The Center's main office is located in Tucson, Arizona; the Center also has an office in Flagstaff, Arizona.

10.     The Center works to insure the long-term health and viability of animal and plant species across the United States and elsewhere, and to protect the habitat these species need to survive.

11.     Plaintiff's members and activists use and enjoy the public lands in the Coconino National Forest – including the Fossil Creek Range allotment – for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Plaintiff's members and activists derive recreational, inspirational,

religious, scientific, educational, and aesthetic benefit from their activities within these areas.
Plaintiff's members and activists intend to continue to use and enjoy the public lands within and
around the Fossil Creek Range allotment frequently and on an ongoing basis in the future,
including this summer.

12.   The aesthetic, recreational, scientific, educational and religious interests of
Plaintiff's members have been and will continue to be adversely affected and irreparably injured
if Defendants continue to authorize livestock grazing and related activities without conducting
adequate environmental analyses or insuring proper protection for wildlife and other resources.
These are actual, concrete injuries caused by Defendants' failure to comply with mandatory
duties under the ESA, NFMA, NEPA, and the APA.  The injuries would be redressed by the
relief sought.

13.   Defendant HEATHER PROVENCIO is the District Ranger of the Red Rock Ranger
District of the Coconino National Forest, based in Flagstaff, Arizona.  As the District Ranger,
Provencio has management and supervisory authority over livestock grazing authorizations on
the Red Rock Ranger District, and is responsible for ensuring that activities within the Red Rock
Ranger District comply with all federal laws and regulations, including the ESA, NEPA and
NFMA.  Defendant Provencio signed the Decision Notice and Finding of No Significant Impact
on the Fossil Creek Range allotment at issue in this case, and Provencio is sued solely in her
official capacity.

14.   DEFENDANT U.S. FOREST SERVICE is an agency or instrumentality of the
United States, and is charged with managing the public lands and resources of the Coconino
National Forest, in accordance and compliance with federal laws and regulations.

15.   DEFENDANT U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States, and is responsible for administering the provisions of the ESA with regard to threatened and endangered terrestrial and freshwater aquatic species, including the endangered Yuma clapper rail and Southwestern willow flycatcher, and the threatened Chiricahua leopard frog, Mexican spotted owl, and Sonoran bald eagle, all of which are found in and around the public lands of the Fossil Creek Range allotment.

## LEGAL BACKGROUND

**Endangered Species Act**

16.   Congress enacted the Endangered Species Act to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

17.   The ESA requires the Secretary of Interior or Commerce ("Secretary") to list species either as threatened or endangered based on the present or threatened destruction, modification, or curtailment of a species' habitat or range, as well as other factors. 16 U.S.C. § 1533(a)(1). An endangered species is one "in danger of extinction throughout all or a significant portion of its range." Id. § 1532(6). A threatened species is one that is "likely to become an endangered species within the foreseeable future." Id. § 1532(20).

18.   Concurrent with listing a species, the Secretary also must designate the species' "critical habitat." 16 U.S.C. § 1533(a)(3). Critical habitat is the area that contains the physical or biological features essential to the "conservation" of the species and which may require special protection or management considerations. Id. at § 1532(5)(A). Critical habitat is the habitat essential for the recovery of the species.

19.   Under § 7 of the ESA, all federal agencies must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

20.   If a species is present in an action area, to fulfill its § 7(a)(2) mandate, an action agency must prepare a biological assessment ("BA") to identify any listed species likely to be affected by an action. 16 U.S.C. § 1536(c)(1). Through a BA, an action agency evaluates potential effects and determines whether a species is "likely to be adversely affected" or "not likely to be adversely affected" by the action. 50 C.F.R. § 402.12.

21.   If a proposed action "may affect" a listed species or its critical habitat, the action agency must consult with the Fish and Wildlife Service. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). For actions which are likely to adversely affect a species, the action agency must seek "formal" consultation, 50 C.F.R. § 402.14(a), while for actions which the action agency concludes will not likely adversely affect a species, the action agency may seek "informal" consultation. *Id.* at § 402.14(b).

22.   Section 7 consultation is required for "any action [that] may affect listed species or critical habitat." 50 C.F.R. § 402.14.

23.   Authorization of grazing is an action "authorized, funded, or carried out" by the Forest Service and therefore requires consultation under the ESA. 16 U.S.C. § 1536(a)(2).

24.   During consultation, the Fish and Wildlife Service ("FWS") must review all relevant information, evaluate the current status of the species or its critical habitat, and evaluate the effects and cumulative effects of the proposed action on the listed species and their critical habitat. 50 C.F.R. § 402.14(g)(1)–(3).

25.    During consultation, the action agency may not make any irreversible or irretrievable commitments of resources that would have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures. 16 U.S.C. § 1536(d).

26.    Informal consultation concludes with a Letter of Concurrence, and is only appropriate when the biological assessment or other information indicates that the action has no likelihood of adverse effect. To concur in an action agency's finding that an action is not likely to adversely affect a listed species, FWS must find that the effects of the proposed action must be completely beneficial, insignificant, or discountable.

27.    At the completion of formal consultation, FWS issues a biological opinion ("BO"), which determines whether the agency action is likely to jeopardize the species or adversely modify the species' critical habitat. If the action's impact on a species' habitat threatens either the recovery or survival of the species, the BO must conclude that the action adversely modifies critical habitat.

28.    The action agency retains the duty to comply with § 7(a)(2) even after FWS issues a biological opinion or Letter of Concurrence.  After the completion of consultation, the action agency must determine whether and in what manner to proceed with the action in light of its § 7 obligations and the BO. 50 C.F.R. § 402.15(a). An action agency may not rely solely on a BO or Letter of Concurrence to establish conclusively its compliance with its substantive obligations under § 7(a)(2).

29.    If FWS makes a jeopardy determination, the BO may specify reasonable and prudent alternatives that will avoid jeopardy and will allow the agency to proceed with the action. 16 U.S.C. § 1536(b). FWS also may "suggest modifications" to the action during the

course of consultation to "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13.

30.    Section 9 of the ESA prohibits any person from "taking" an endangered species. 16 U.S.C. § 1538(a)(1).  "Take" is defined broadly under the ESA and its regulations to include harassing, harming, wounding, killing, trapping, capturing, or collecting a listed species either directly or by degrading its habitat sufficiently to impair essential behavior patterns. 16 U.S.C. § 1532(19).  This so-called "take" prohibition has been extended to threatened species, including the Chiricahua leopard frog.  50 C.F.R. §§ 17.31, 17.43.

31.    One exception to § 9's take prohibition is relevant here. A federal agency may take a listed species in accordance with an Incidental Take Statement ("ITS"), which is an essential element of a BO. 16 U.S.C. § 1536(b)(4). However, the agency is only exempted from § 9's take provision if the terms and conditions of the ITS are followed. Id. § 1536(o)(2).

32.    The BO should include an ITS if such take may occur. 50 C.F.R. § 402.14(g)(7). The ITS (1) specifies the amount or extent of the impact on the species of any incidental taking, (2) specifies Reasonable and Prudent Measures to minimize such impact, and (3) sets forth the Terms and Conditions that must be complied with to implement the Reasonable and Prudent Measures. Id. § 402.14(i)(1)(i), (ii), (iv).

33.    The incidental take statement must also "specif[y] the impact, i.e., the amount or extent, of such incidental taking on the species," and must also include a so-called "trigger" for reconsultation."  50 C.F.R. § 402.14(i).

34.    If during the course of the action the amount or extent of incidental taking specified in the ITS is exceeded, the action agency must immediately reinitiate consultation. 50 C.F.R. §§ 402.14(i)(4), 402.16(a).

**National Forest Management Act**

35.   In 1976, Congress enacted the National Forest Management Act, 16 U.S.C. §§ 1600–1614, which governs the United States Forest Service's management of the national forests.

36.   NFMA establishes a two-step process for forest planning. NFMA first requires the Forest Service to develop, maintain, and revise "land and resource management plans" ("LRMPs" or "Forest Plans") for each national forest. Id. § 1604(a); *see also* 36 C.F.R. § 219.10(a), (b).  Forest Plans guide natural resource management activities forest-wide, setting standards, management area goals and objectives, and monitoring and evaluation requirements.

37.   Implementation of a Forest Plan occurs at the site-specific level – that is, once a Forest Plan is in place, site-specific actions, such as issuance of a federal grazing permit, are assessed by the Forest Service in the second step of the forest planning process.

38.   Site-specific decisions must be consistent with the broader Forest Plan. 16 U.S.C. § 1604(i).

39.   NFMA also requires the Forest Service to provide animal and plant diversity in the national forests. 16 U.S.C. § 1604(g)(3)(B).  Forest Service's regulations adopted in 1982 and in place at the time the Forest Service adopted the Coconino Forest Plan (often referred to as the "1982 Planning Regulations") require the Forest Service to manage forests for viable populations of native vertebrate and desired non-native species. 36 C.F.R. § 219.19 (2000).

40.   To ensure that viable populations are maintained in the national forest, the Forest Service regulations require that the agency identify management indicator species ("MIS") and that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat change determined." 36 C.F.R. § 219.19(a)(6) (2000).

41.   Further, the regulations state "each Forest Supervisor shall obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction." Id. § 219.12(d) (2000). To ensure biological diversity, the regulations specifically require that "[i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." Id. § 219.26 (2000).

**National Environmental Policy Act**

42.   The purpose of the National Environmental Policy Act is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4331. NEPA's fundamental purposes are to guarantee that: (1) agencies take a "hard look" at the environmental consequences of their actions before these actions occur by ensuring that the agency carefully considers detailed information concerning significant environmental impacts; and (2) agencies make the relevant information available to the public so that it may also play a role in both the decisionmaking process and the implementation of that decision. 40 C.F.R. § 1500.1.

43.   Under NEPA and the implementing regulations, all federal agencies – including the Forest Service – must prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. An agency may first prepare an Environmental Assessment, but if there is any question that a proposed action may be "significant," then the agency is required by NEPA to perform a full EIS. *Id.*

44.   Whether there may be a significant impact on the environment requires consideration of two broad factors: "context" and "intensity." 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(C). Context means the "significance of an action must be analyzed in several contexts such as society as a whole . . . , the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a).

Intensity indicates the "severity of impact," which includes consideration of, *inter alia*, the unique characteristics of the geographic area; the degree to which the effects on the environment are likely to be highly controversial; the degree to which the possible effects on the environment are highly uncertain or involve unique or unknown risks; and whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Id. at § 1508.27(b).

45.   NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §4332(2)(E). The analysis of alternatives is the "heart" of the environmental review process; the EIS must "rigorously explore and objectively evaluate all reasonable alternatives," in order to "provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14(a).

46.   NEPA also requires federal agencies to analyze the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1508.7, 1508.8. Cumulative impacts are defined under NEPA as "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions [of federal, state, and private actors]." 40 C.F.R. § 1508.7. Cumulative impacts may result "from individually minor but collectively significant actions taking place over a period of time." Id.

47.   In addition to alternatives and impacts, NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the proposed action. 40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16 (environmental consequences and mitigation measures).

48.    When preparing an environmental review, an agency must ensure that high quality

information is available to the agency and the public before any decision is made or any action is

taken.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to

implementing NEPA.  40 C.F.R. § 1500.1(b).  The agency is required to identify clearly all of its

assumptions, to explain any inconsistencies, to disclose all methodologies used, to rebut all

contradictory evidence, to eliminate guesswork, to make explicit reference to sources relied upon

for conclusions, and to record in an understandable manner the basis for those conclusions. 40

C.F.R. § 1502.24.

## FACTUAL BACKGROUND

**Fossil Creek Range Allotment**

49.    The Fossil Creek Range Allotment ("Fossil Creek allotment" or "allotment") lies

between Flagstaff and Phoenix, and is located in the Red Rock Ranger District of the Coconino

National Forest.  Fossil Creek is bounded on the north by Highway 260 and on the east by Fossil

Creek, and it totals approximately 42,200 acres of public lands.

50.    Elevations in Fossil Creek range from approximately 3,000 feet up to 6,300 feet,

and vegetation is mostly pinon-juniper woodlands, with small portions of ponderosa pine at the

higher elevations, and pinon-juniper grassland and high desert shrubs/grasslands at the lower

elevations.

51.    The public lands within Fossil Creek provide habitat for a host of wildlife,

including the endangered Yuma clapper rail and Southwestern willow flycatcher, the threatened

Mexican spotted owl, Chiricahua leopard frog, and the Sonoran Desert bald eagle.  Many other

sensitive and MIS species are also found throughout the allotment.

COMPLAINT - 12

52.   At the time of the Forest Service's analysis, only two "precariously small" populations of Chiricahua leopard frog existed within the Fossil Creek Range allotment.  In contrast, in 2001, Chiricahua leopard frog occupied at least 10 sites within the allotment, which formed a metapopulation of frogs.

53.   There are two wilderness areas located within the Fossil Creek Range allotment: the Fossil Springs Wilderness and the Mazatzal Wilderness.  The Upper and Lower Wilderness Pastures in the Fossil Creek Range allotment are entirely made up of the Fossil Springs Wilderness, and the Mazatzal Wilderness is located in portions of the Surge and Stehr Lake pastures.

54.   The Forest Service has carved the allotment into 31 separate grazing pastures, with the lower elevation pastures located in the north-central of the allotment, and the higher elevation pastures to the west and south.  In total, 29% of the public lands are Slope Class I (i.e., 0-10% slope), Slope Class II (11-30%), and Slope Class IV (>40%), respectively, and the remaining 12% has a slope of 31-40% (Slope Class III).

55.   The Forest Service has documented degraded soil conditions across the allotment, with only 4% of the soils in satisfactory condition, and fully 96% in unsatisfactory, impaired, or inherently unstable conditions.  Current soil loss is about 35% above normal, which translates into a soil loss of close to 8 tons per hectare per year.

56.   The Forest Service's own "capability" determination found only 1,525 acres (3.6%) of the entire allotment were at "full capacity," which means that the slope is 1-10% with satisfactory soil conditions.  This analysis also showed that 28,031 acres (66%) were at "potential capacity" (i.e., 0-40% slope with impaired/unsatisfactory soil condition), and 12,577 acres (30%) were at "no capacity (>40% slope with inherently unstable soils).

57.    The soils in the "no capacity" category have a natural soil loss (without any management actions) that exceeds the maximum level that can occur while sustaining soil productivity.

58.    The Forest Service range condition and trend data is spotty at best, but the data it does have demonstrates degradation across the allotment.  The data shows that only 7% of the allotment is improving, while 60% or 87% demonstrates decreasing range condition depending on the data source.

59.    The Forest Service acknowledges that the recent "drought period, couple [sic] with livestock grazing, are believed to be significant factors in the decline in range condition and trend."

60.    There are a host of riparian areas throughout the allotment, totaling 143 miles of streams courses within and adjacent to the allotment; of these, approximately 11 miles are riparian in nature – i.e., containing the vegetation generally associated with riparian habitats.  There are also nine uplands lentic areas – i.e., seeps, springs, and wet meadows – in the allotment.

61.    The Forest Service has limited data on the condition of these riparian areas, and it most recently conducted proper functioning conditions (PFC) analysis in 1998 and 2002.  This analysis showed that five of the 10 stream reaches in the allotment were in PFC, three reaches were in unknown condition, and two were at risk.  The Forest Service's data on lentic areas is not much better: the Service has never monitored five of the nine lentic areas, and 1999 was the last time it monitored the other four areas.

62.   The grazing system currently used is an intensive deferred-rest rotation management strategy, modeled after the Savory Method.  Under the prior grazing permit, the Forest Service allowed 477 head of livestock to graze year-round for a total of 5,795 AUMs.

63.   From 1995 through 2001, actual use averaged about 95% of permitted use, but actual use was reduced from 2002-2006, and the Forest Service completely closed the Fossil Creek allotment in 2002 and 2005-06.

64.   More specifically, in September 2004, the Forest Service decided to remove livestock from the allotment due to concerns regarding lack of forage and water.  In October 2004, livestock were removed from the allotment for an indefinite period.  The permittee concurred with this decision.

65.   On or around June 2006, then-Congressman Rick Renzi contacted the Forest Service and "pressure[d]" the Forest Service to allow grazing to resume in the Fossil Creek Range allotment.

66.   JP Morgan-Chase is the current permittee on the Fossil Creek Range allotment.

**The Coconino National Forest Plan**

67.   The Forest Service published the Coconino National Forest Land and Resource Management Plan in August 1987.  The Service has subsequently amended the plan several times since then, but the Coconino Forest Plan remains the applicable forest plan directing management of the public lands in the Coconino National Forest.

68.   The Coconino Forest Plan outlines and adopts specific goals, objectives, and standards and guidelines for a host of actions and activities within the forest, including management of wildlife habitat, livestock grazing and range, off-road driving, geothermal development, roads and transportation system, and others.

69.   Regarding management of livestock grazing across the forest, the Forest Plan requires the Forest Service to "[m]anage grazing use to maintain or enhance condition classes of full capacity rangelands."   The Forest Service adopted a specific standard and guideline to accomplish the goal that "[p]ermitted use and capacity are assigned based on full capacity range only."

70.   The Coconino Forest Plan also adopted an objective to "manage habitat to maintain viable populations of wildlife and fish species and improve habitat for selected species," with "viable populations" meaning "[a] wildlife or fish population of sufficient size to maintain its existence over time in spite of normal fluctuations in population levels."

71.   The Coconino Forest Plan also adopted monitoring requirements for wildlife, including the obligation to survey all potential Mexican spotted owl areas – including a ½ mile buffer beyond the action area – prior to authorizing any actions within or adjacent to spotted owl habitat.

72.   The Forest Plan adopted specific limits on livestock utilization of grasses and forbs within Mexican spotted owl habitat, and required the Forest Service to "[i]mplement forest plan utilization standards and guidelines to maintain owl prey availability, . . . maintain and restore riparian ecosystems, and promote development of owl habitat."   These utilization limits are dependent on the condition of the range and the season-of-use, and vary from 0% allowable use on very poor range within continuous proposed grazing, up to 50% on public lands in excellent condition and rested two out of three years.

73.   The Forest Plan allowed for adjustment of these utilization limits, but only by amending or revising the Forest Plan.

**Current Decision-Making Process**

74.   In November 2006, the Forest Service initiated an allotment evaluation for the Fossil Creek Range allotment, a process designed to result in an environmental assessment looking at grazing in the allotment.

75.   At the outset, the Forest Service acknowledged that "there is a need to maintain and/or improve rangeland and soil conditions" in the Fossil Creek Range allotment.

76.   On or around January 17, 2007, the Forest Service circulated a draft proposed action on the Fossil Creek Range allotment.  This proposal called for an initial use level of 2,400 Animal Unit Months or "AUMs" – with one AUM equal to the amount of forage necessary to sustain one cow for one month – and allowing up to a maximum number of 3,600 AUMs on the allotment after conditions improved.

77.   The Forest Service admitted that existing conditions could not presently support 3,600 AUMs of livestock grazing.

78.   On January 24-25, 2007, the Forest Service convened a meeting of its so-called Interdisciplinary Team – in addition to other agency staff, experts, as well as representatives of the livestock permittee on the allotment – to review the proposal.

79.   During the meeting, the legal counsel for the permittee objected to the grazing levels in the proposal, and proposed that the Forest Service "use the historical numbers" – i.e., "[u]se the maximum permitted numbers" dating back to 1961.

80.   In response, the Forest Service noted that the current grazing levels were "set in the 1990s and did not take into consideration . . . all the factors of soil condition, slope, inherently unstable lands, water sources, among other factors."

81.    In response, the Forest Service's lead range conservationist doubted whether it "will . . . ever be feasible/possible to get to 477 AUM level" again.

82.    After this meeting, the Forest Service revised its proposed action to include much higher grazing use – far higher than the proposed use of 210 head of livestock totaling an initial use of 2,400 AUMs, and more in line with the requests of the permittee's legal counsel.

83.    In its modified proposal, the Forest Service proposed an initial level of 3,600 AUMs, and allowing up to 485 head of livestock to use the area year-round for a total of over 5,000 AUMs.

84.    Just days before, however, the Forest Service admitted that this level was not attainable on the allotment without causing adverse consequences to the public lands and wildlife habitat in the allotment.

85.    According to the Forest Service's lead biologist, this proposal was a "radically different" grazing level, and the Forest Service provided no rationale for the change.

86.    A second Forest Service staffer echoed these comments, and queried if there was a basis for increasing grazing from 210 head to 485 head.

87.    The Habitat Program Manager for the Arizona Game and Fish Department also opposed this increase in grazing and noted that grazing should be limited to 150 head of livestock.  He also noted that during the earlier meeting there was no disagreement among the experts regarding appropriate grazing levels, and, instead, the only voice of dissent came from the permittee's lawyer.

88.    Indeed, according to one agency staffer, all parties – including the Forest Service's own team members – expressed significant concerns with the modified grazing levels.

89.    On March 21, 2007, the Forest Service initiated public scoping for the Fossil Creek

Range allotment environmental assessment, and identified the proposed action as permitting 483

head of livestock to graze the allotment totaling a maximum of 5,800 AUMs. The Forest Service

acknowledged that current conditions would not support this grazing level, and claimed that

grazing would be authorized at reduced levels until the condition of the public lands improved.

90.    In response to this scoping notice, the Arizona Fish and Game Department and

others again opposed the proposed stocking rate and utilization levels. The Department

recommended that the Forest Service adopt a more conservative approach, and stock the

allotment with only 150 head of livestock and adopt a 20% utilization rate.

91.    In March 2008, the Forest Service issued a draft Environmental Assessment, in

which the Forest Service proposed to adopt the grazing scheme outlined in its earlier proposed

action and scoping notice.  More specifically, in the draft EA, the Forest Service proposed to

authorize year-long grazing on the allotment with a maximum of 5,800 AUMs, which equates to

483 head of livestock for a 12-month period.

92.    In the draft EA, the Forest Service acknowledged that current conditions cannot

support the proposed level of grazing, and the Forest Service claimed that it would authorize 300

head of livestock for 12 months (totaling 3,600 AUMs) until the range conditions improve.

93.    The draft EA does not discuss or otherwise explain how the Forest Service reached

its initial stocking rates, despite the fact that just months before, employees of the Forest Service,

the Fish and Wildlife Service, and the Arizona Fish and Game Department all supported a much

lower grazing level.  Indeed, the Forest Service itself concluded that current conditions would

not allow livestock use above 2,400 AUMs.

**Biological Assessment and Biological Opinion**

94.   On July 7, 2008, the Forest Service submitted a Biological Assessment to the U.S. Fish and Wildlife Service and requested the initiation of formal consultation under the Endangered Species Act.

95.   In its BA, the Forest Service concluded that the livestock grazing system outlined in the draft EA "may adversely affect the Chiricahua leopard frog and its habitat." More specifically, the Forest Service concluded that the proposed grazing would harm occupied and suitable frog habitat, and would further adversely affect frog habitat by causing increased sedimentation and subsequent decreased water quality.

96.   The BA also examined the impacts of the grazing scheme on the Mexican spotted owl. In that case, the Forest Service concluded that the grazing scheme may affect, but is not likely to adversely affect the owl. In reaching this conclusion, the Forest Service claimed that the so-called conservative utilization levels proposed in the draft EA – i.e., 30-40% – will provide the needed plant cover to maintain fruits, seeds and regeneration to provide for the needs of owl prey species in the allotment.

97.   In the BA, the Forest Service also concluded that the grazing scheme outlined in the draft EA "may affect but it is not likely to adversely affect the southwestern willow flycatcher and its habitat."

98.   Prior to making this determination, the Forest Service did not collect any recent data on flycatcher use and occupancy of the public lands within the Fossil Creek Range allotment. Indeed, the Forest Service had not collected any population or use data on the flycatcher since 1994.

99. The Forest Service nevertheless concluded that the proposed grazing scheme will not measurably or detectably reduce suitability or regeneration of flycatcher habitat, any indirect effects will be insignificant or discountable, and the grazing scheme comports with – or is more conservative than – the Southwestern Willow Flycatcher Final Recovery Plan.

100. On February 9, 2009, the U.S. Fish and Wildlife Service issued its final Biological Opinion, thereby completing consultation under the ESA. FWS concurred with the Forest Service's determination that the grazing scheme may affect but is not likely to adversely affect Mexican spotted owl and Southwestern willow flycatcher.

101. The BO also concluded that the livestock grazing scheme was not likely to jeopardize the continued existence of Chiricahua leopard frog or destroy or adversely modify designated critical habitat.

102. However, the BO did admit that "take" would occur through direct mortality and injury to Chiricahua leopard frog adults, metamorphs, tadpoles and egg masses, as well as harm or harassment of frogs resulting from loss of habitat.

103. The BO included an Incidental Take Statement because FWS was "reasonably certain" that the grazing scheme would result in "take" of the threatened Chiricahua leopard frog.

104. In the Incidental Take Statement ("ITS"), FWS did not quantify the level of expected "take" of Chiricahua leopard frog, nor did FWS identify any habitat surrogate for expected take.

105. Nor did FWS identify a reasonable "trigger" for reconsultation, instead claiming that the incidental take would be exceeded – and reconsultation required – only "if after a period of two consecutive years, the species is considered extirpated from the Red Rock Ranger District as a result of livestock management."

**Final Environmental Assessment and Finding of No Significant Impact**

106.  On April 2, 2009, the Forest Service issued its final EA.

107.  In the EA, the Forest Service acknowledged the need to modify grazing to improve

vegetation, soil, and habitat conditions on the allotment, as the Forest Service's existing data – as

discussed in the draft EA – showed that the conditions of the public lands and resources were not

meeting the requirements of the Coconino Forest plan and other legal requirements.

108.  The proposed grazing scheme in the Final EA largely reflects the grazing scheme

identified in the draft EA.  The proposed action called for authorizing a maximum of 483 head of

livestock for 12 months (totaling 5,800 AUMs), with an initial stocking rate of 300 head for 12

months (totaling 3,600 AUMs).

109.  The proposed action calls for assigning a grazing capacity on all Full and Potential

capacity rangelands, as well as rangelands with "no capacity."

110.  The proposed action also includes a 30-40% forage utilization rate in the uplands

across the allotment, while allowing a 20% utilization rate on woody vegetation in the riparian

areas.

111.  In the intervening years since the draft EA, the Forest Service did not collect

additional data of the baseline conditions of the streams, springs, and water courses; the Forest

Service did not collect any additional data on forage production, either.  Nor did the Forest

Service use these years to collect background population and habitat data in the Fossil Creek

allotment on threatened and endangered species, including the Mexican spotted owl, Yuma

clapper rail, Southwestern willow flycatcher, or Sonoran Bald eagle.

112.  Similarly, the Forest Service lacked basic baseline data on a series of sensitive

species found in and around the Fossil Creek Range allotment, including Northern Goshawk,

Peregrine falcon, Western Yellow-billed cuckoo, Ferruginous hawk, as well as a host of bats, amphibians, and invertebrates.

113. On April 28, 2009, the District Ranger Heather Provencio signed a Decision Notice and Finding of No Significant Impact.

114. On June 15, 2009, Plaintiff Center for Biological Diversity appealed the Forest Service's Fossil Creek Range allotment grazing authorization, environmental assessment, and finding of no significant impact.

115. On July 23, 2009, the Forest Service denied the Center's administrative appeal.

## FIRST CLAIM FOR RELIEF:
### Violation of the National Forest Management Act and APA
### Consistency Requirement

116. Plaintiff realleges and incorporates by reference all preceding paragraphs.

117. The National Forest Management Act requires that all site-specific decisions "shall be consistent with the [Forest Plan]." 16. U.S.C. § 1604(i). The Forest Service's regulations implementing the NFMA indicate that land and resource management plans "guide all natural resource management activities and establish management standards and guidelines for the National Forest System. They determine resource management practices, levels of resource production and management, and the availability and suitability of lands for resource management." 36 C.F.R. § 219.1(b).

118. The Forest Service has violated the NFMA because the agency has failed to comply with the Coconino Forest Plan standards for utilization within Mexican spotted owl habitat, utilization and forage use standards forest-wide, standards directing that permitted use and capacity are assigned based on full capacity range only, as well as other standards for riparian

vegetation, fish and wildlife populations and habitat, and water quality, within the Fossil Creek Range allotment.

119.   Therefore, the Forest Service's authorization of detrimental livestock grazing practices via its 2009 Fossil Creek Range Allotment grazing authorization and associated NEPA documents violates the Coconino Forest Plan, the National Forest Management Act, 16 U.S.C. § 1604(i), and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and therefore must be reversed and set aside under 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF:
### Violation of the National Forest Management Act and APA
### MIS Viability

120.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

121.   The Forest Service has violated the Coconino Forest Plan, NFMA and its implementing regulations because the agency has failed to comply with its mandatory obligations to monitor population trends of Management Indicator Species ("MIS") and their relationships to habitat change or, in the alternative, consider best available science.

122.   The Forest Service's Fossil Creek Range allotment grazing authorization and associated NEPA documents do not contain the required monitoring information on all MIS species in the applicable Management Areas, including Management Areas 2, 4, 7, 10, and 12 – including, among others, Northern goshawk, pygmy nuthatch, Abert squirrel, Red squirrel, Hairy woodpecker, titmouse, common teal, Lincoln's sparrow, Yellow breasted chat, Lucy's warbler, and a host of macroinvertebrates.

COMPLAINT - 24

123.   The Forest Service's failure to undertake the required monitoring for these species –

designated MIS under the Coconino Forest Plan – renders its decisions in violation of the

Coconino Forest Plan, the National Forest Management Act, 16 U.S.C. § 1604(g)(3)(B) & (i),

and its implementing regulations, and renders the decisions arbitrary, capricious, an abuse of

discretion, and not in accordance with law, and therefore must be reversed and set aside under 5

U.S.C. § 706(2)(A).

WHEREFORE, Plaintiff prays for relief as set forth below.

### THIRD CLAIM FOR RELIEF:
**Violation of the Endangered Species Act and APA
Incidental Take Statement**

124.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

125.   ESA § 7(b)(4) requires FWS to issue an incidental take statement whenever a

proposed federal agency action will not jeopardize a protected species but will result in

incidental take of members of the species.  16 U.S.C. § 1536 (b)(4).  The incidental take

statement must specify "those reasonable and prudent measures that the Secretary considers

necessary or appropriate to minimize such impact" and "the terms and conditions . . . that must

be complied with by the Federal agency . . . to implement the measures." Id.

126.   The incidental take statement must "specif[y] the impact, i.e., the amount or extent,

of such incidental taking on the species," and must also include a so-called "trigger" for

reconsultation." 50 C.F.R. § 402.14(i)(i); *Oregon Natural Resources Council v. Allen*, 476 F.3d

1031 (9th Cir. 2007).

127.   FWS has violated § 7(b)(4) of the ESA, 16 U.S.C. § 1536 (b)(4), by issuing an

incidental take statement with the Biological Opinion that failed to adequately quantify take,

failed to include a reasonable trigger for reconsultation, and failed to meet the other mandatory requirements under the Endangered Species Act.

128. FWS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, and therefore must be reversed and set aside under 5 U.S.C. §§ 701 - 706.

WHEREFORE, Plaintiff prays for relief as set forth below.

### FOURTH CLAIM FOR RELIEF:
### Violation of the Endangered Species Act
### Jeopardy

129. Plaintiff realleges and incorporates by reference all preceding paragraphs.

130. The Forest Service and FWS are violating Section 7(a)(2) of the ESA and its implementing regulations as set forth at 50 C.F.R. § 402.16 by failing to ensure through consultation that the Forest Service's approval and implementation of livestock grazing and other management actions on the Fossil Creek Range allotment do not jeopardize Chiricahua leopard frog and Mexican spotted owl or destroy or adversely modify its critical habitat. The Forest Service is violating this provision by carrying out these actions notwithstanding the fact that the February 9, 2009 Biological Opinion – and supplemental analysis – are arbitrary and capricious. FWS is violating this provision by approving the Forest Service's actions, which will either jeopardize the Chiricahua leopard frog and Mexican spotted owl, or destroy or adversely modify critical habitat.

131. These violations are subject to judicial review under 16 U.S.C. § 1540(g).

WHEREFORE, Plaintiff prays for relief as set forth below.

### FIFTH CLAIM FOR RELIEF:
### Violation of the National Environmental Policy Act and APA

132. Plaintiff realleges and incorporates by reference all preceding paragraphs.

133.  This Fifth Claim for Relief challenges Defendants' violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations, in failing to prepare an Environmental Impact Statement prior to issuing grazing decisions on the Fossil Creek Range Allotment and in failing to undertake a thorough and objective assessment of the environmental implications of the new final grazing decision.  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706(1).

134.  The Forest Service violated NEPA and federal regulations in multiple respects through issuance of the final grazing decision on the Fossil Creek Range allotment, including, but not limited to:

a.   Adopting the final grazing decision on the Fossil Creek Range allotment without first preparing an Environmental Impact Statement examining the ecological impacts of the grazing scheme on the wildlife populations, habitat, wilderness and public lands within the allotment, and, instead, electing to prepare an Environmental Assessment and Finding of No Significant Impact;

b.   Adopting the final grazing decision without first taking the requisite "hard look" at the direct and indirect impacts of the grazing scheme, including the impacts to wildlife populations, habitat, wilderness, and public lands within the Fossil Creek Range allotment;

c.   Adopting the final grazing decision without first examining the cumulative impacts of the grazing scheme together with the past, present, and reasonably foreseeable future actions in and around the Fossil Creek Range allotment; and, further, in failing to examine the cumulative impacts of the grazing scheme together with the impacts of recurrent drought and climate change on the fragile desert landscape in and around the allotment;

d.   Adopting the final grazing decision without first examining a reasonable range of alternative courses of actions that meet the stated purpose and need to improve the condition of the public lands and wildlife habitat within the Fossil Creek Range allotment; and

e.   Adopting a final decision that does not meet the stated purpose and need of improving vegetative conditions and trends, soil conditions, riparian conditions, and wildlife habitat conditions across the Fossil Creek Range allotment.

135.   Accordingly, Defendants' final decisions are arbitrary, capricious, an abuse of discretion, and not in accordance with the National Environmental Policy Act, and therefore must be reversed and set aside under 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.      Order, declare, and adjudge that the Forest Service violated the Coconino National Forest Plan, the National Forest Management Act, and its implementing regulations in adopting the Grazing Authorization on the Fossil Creek Range Allotment;

B.      Order, declare, and adjudge that the Forest Service violated Section 7(a)(2) of the Endangered Species Act in adopting the Grazing Authorization on the Fossil Creek Range Allotment;

C.      Order, declare, and adjudge that the Forest Service violated the National Environmental Policy Act and its implementing regulations in issuing its Decision Notice and Finding of No Significant Impact for the Grazing Authorization on the Fossil Creek Range Allotment;

D.      Reverse and set aside the Grazing Authorization on the Fossil Creek Range allotment;

E.      Order, declare, and adjudge that the U.S. Fish and Wildlife Service's February 9, 2009 Biological Opinion is invalid under the APA, 5 U.S.C. § 706(2)(A), because it misses key impacts on Chiricahua leopard frog and Mexican spotted owl; it runs counter to evidence available to the agency; the incidental take statement issued fails to adequately quantify the taking of frogs, and fails to include a reasonable trigger for reconsultation; it authorizes the Forest Service to proceed with a grazing scheme that is likely to jeopardize the Chiricahua leopard frog within the meaning of ESA section 7(a)(2) and is thus arbitrary and capricious, and contrary to the ESA and its implementing regulations, in violation of the ESA § 7 and the APA, 5 U.S.C. § 706;

F.      Reverse and set aside the Biological Opinion and the incidental take statement;

G.      Enter such other temporary, preliminary, and/or permanent injunctive relief as may be prayed for hereafter by Plaintiff;

H.      Award Plaintiff its reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or all other applicable authorities; and

I.      Grant such further relief as the Court deems just and proper in order to remedy Defendants' violations of the NFMA, ESA, NEPA and APA.

Dated this 1st day of June, 2010

Respectfully submitted,

Todd C. Tucci (#6526)
*Advocates For The West*
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
ttucci@advocateswest.org

Attorney for Plaintiff Center for Biological
Diversity

COMPLAINT - 30